## STANTON v. HAMPLE.

(Circuit Court of Appeals, Ninth Circuit. April 4, 1921.)

No. 3537.

1. Corporations ⊙320(11½)—Instruction submitting theory that defendant president of corporation, in selling his own and plaintiff's stock, made secret profit, warranted.

In an action by plaintiff, a stockholder, who disposed of his shares in connection with the sale of his own shares by defendant, the corporate president and manager, an instruction submitting the theory that defendant without plaintiff's knowledge, obtained $20 additional per share, not only for his own shares, but for those belonging to plaintiff, *held* warranted under the evidence, and in view of the fact that defendant's counsel requested similar instructions.

2. **Appeal and error ⊜═882 (14)—Defendant, having requested instruction submitting issue, cannot complain that others on same issue were not supported by the evidence.**

Where defendant requested instructions submitting a particular issue, he cannot complain that those given on behalf of plaintiff, dealing with the same issue, were not supported by the evidence.

3. **Appeal and error ⊜═237 (3), 294 (1)—In the absence of motion for nonsuit or new trial, issues are properly submitted to the jury.**

In action by stockholder, who sold his shares in connection with the sale by defendant of his own stock, to recover an alleged secret profit which defendant made on sale of plaintiff's stock, that issue is properly submitted to the jury, in the absence of requested directed verdict, motion for nonsuit, or motion for new trial, regardless of the sufficiency of the evidence to present it.

4. **Corporations ⊜═320 (11½)—Instruction, in suit against president for sum received on sale of stock in connection with his own, held within the issues, not confusing, and justified by evidence.**

In an action by a stockholder, who disposed of his shares in connection with sale of his own shares by defendant, the president and manager, to recover a sum which it was contended defendant received on account of the sale of plaintiff's shares, where the amended answer alleged that plaintiff sold and negotiated the sale of his own stock, an instruction that, if plaintiff negotiated the sale without consulting defendant and fixed his own price, there could be no recovery, though defendant may have received a greater price for his own stock, unless a part of the consideration for the sale of plaintiff's stock was paid to and received by and retained by defendant, *held* within the issues, and not confusing, and justified by evidence that defendant was paid a certain amount on plaintiff's stock.

5. **Corporations ⊜═320 (11½)—Instructions should not technically discriminate between agency, fraud, or breach of confidence.**

In an action by plaintiff, a stockholder, who claimed that in selling his shares in connection with a sale of his own stock by defendant, the president made a secret profit, instructions should submit the law clearly to the jury, and not indulge in unnecessary technical discriminations between agency, fraud, or breach of confidential relations.

6. **Trial ⊜═229—Repetition of qualification to instructions held not confusing.**

Where the qualification added by the court to several instructions was required to make the issues clear to the jury, it was not confusing so to repeat.

In Error to the District Court of the United States for the Northern Division of the Eastern District of Washington; Frank H. Rudkin, Judge.

Action by J. E. Hample against E. H. Stanton. Judgment for plaintiff, and defendant brings error. Affirmed.

Action at law to recover $21,926.67, with interest thereon from May 21, 1917, alleged to be due the plaintiff in a transaction involving the sale to Armour & Co., of Chicago, of 1,096⅓ shares of stock owned by the plaintiff in the E. H. Stanton Company, of Spokane, Wash. The case was tried before a jury, which rendered a verdict in favor of the plaintiff for $25,109.06. Judgment accordingly.

Jas. A. Williams, and Danson, Williams & Danson, all of Spokane, Wash., for plaintiff in error.

William G. Graves, Graves, Kizer & Graves, Lee & Kimball, and W. E. Cullen, all of Spokane, Wash., for defendant in error.

⊜═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before GILBERT, MORROW, and HUNT, Circuit Judges.

MORROW, Circuit Judge. The plaintiff, J. E. Hample, and the defendant, E. H. Stanton, were stockholders in a corporation known as the E. H. Stanton Company, engaged in the general business of buying live stock and other meat products, butchering, packing, preserving, and selling the same at its plant located in Spokane, state of Washington. The capital stock of the corporation was $600,000, divided into 6,000 shares, of the par value of $100 each. The defendant, Stanton, and members of his family, owned 2,420⅔ shares. The plaintiff, Hample, owned 1,096⅓ shares, and J. L. Hamilton, plaintiff in another suit of a similar character to this one (272 Fed. 432), also owned 1,096⅓ shares. These three parties owned all together 4,613⅓ shares of the 6,000 shares of the stock of the corporation.

Hample and Hamilton resided at Butte, Mont. Stanton resided at Spokane, Wash., and was the president and sole manager of the E. H. Stanton Company, and drew a salary of $300 per month for his services. He and his son were two of its board of four directors, Hample and Hamilton being the other two. The latter were dependent upon Stanton for information concerning the business affairs of the corporation. This information was contained in statements and reports made to them from time to time by Stanton.

On May 8, 1917, E. H. Stanton gave a written paper to Fred B. Grinnell, a broker of Spokane, in which it was stated, that Stanton claimed to own or control 5,084⅓ shares of the capital stock of the E. H. Stanton Company, and that Grinnell had been given an option on said stock for 15 days from date upon the payment of $220 per share in cash. Stanton's claim that he owned or controlled 5,084⅓ shares of the stock of the company necessarily included his own stock, (2,420⅔ shares), together with that of Hample and Hamilton (1,096⅓ shares each), making a total of 4,613⅓ shares, and 471 additional shares, not identified.

This supposed option on 5,084⅓ shares was immediately telegraphed to Armour & Co. at Chicago, and in response to this telegram George B. Robbins, the vice president of Armour & Co., and John E. O'Hern, the general superintendent of all the Armour plants, came to Spokane. The former arrived on Sunday, May 13th, and the latter on Monday, May 14th. O'Hern looked over the plant for two or three days, during which time he and Robbins had a number of conferences with Stanton, asking for information concerning the plant and its business. Robbins conferred with Stanton with regard to the price; the former stating that Armour & Co. could not pay cash. He also told Stanton that there were some back accounts that would have to be guaranteed. Stanton went to Butte to confer with Hample and Hamilton about the sale, arriving there on May 16th. He did not then or at any other time mention to either Hample or Hamilton anything about the option he had given for $220 per share on 5,084⅓ shares of the stock of the company. He did explain to them that there was a prospect of making a sale to Armour & Co., and he represented that Stanton Company had a large amount of stock of frozen meat on hand and condi-

tions were unsettled; that the government had required the Stanton Company to put in improvements that would cost $150,000 or $200,-000; that, if they did not sell to Armour & Co., that company would start a plant of its own, and Stanton Company would have to compete with Armour & Co., and would probably lose money. They talked about a sale at $150 per share.

Stanton returned to Spokane from Butte on May 17th. Hample and Hamilton followed, arriving there on May 18th. Stanton had told them in Butte that he had said to Armour & Co. that he would not sell his own stock unless it took care of them, and when they reached Spokane he took them out to the plant, showed them around, and then took them to his house as his guests. He said that Armour & Co. had not made a proposition; that it only wanted to buy a certain amount of stock, but that he would not sell his stock, unless Hample and Hamilton sold theirs. He said he would drive as hard a bargain with Armour & Co. as he could, and that whatever he got for his stock Hample and Hamilton would get for theirs. He told them that all their stock ought to be sold together, and that he wanted to do the trading, and would make the hardest trade he could, repeating that whatever he got for his stock they would get for theirs, and that he didn't want to make a cent off of them.

After looking the plant over, Hample and Hamilton were confirmed in their opinion that the price suggested by Stanton, in Butte, of $150 per share, was too low, and said they would not consider a sale at that price. Stanton then suggested that they might be able to get as much as $175, and said that, if he could get $175 for his stock, he was ready to sell it. Hample thereupon offered to take his (Stanton's) stock at that figure and pay cash for it, upon which Stanton laughed and said that he might possibly do a little better.

Hample and Hamilton remained in Spokane for several days. Stanton continued to talk discouragingly of the value of the property, but represented that he was crowding Armour & Co. up, and had got its representatives where he thought they would pay $190. About this time Hamilton said that he would not consider less than $200 a share for his stock, and that if Armour & Co. did not want to close on that basis he was going home. He had gone to the hotel, paid his bill, and started for home. Upon learning this, Stanton informed Hample and Hamilton that he could get $200 for the stock, and took Hample and Hamilton to Mr. Robbins, and the deal was closed at $200 per share.

The Hample stock was to be deposited in the First National Bank at Butte on or before May 25, 1917, to be delivered to Armour & Co. upon the payment of $43,266.66 and the delivery of four notes, for $44,-000 each, payable, respectively, in 1918, and 2, 3, and 4 years from date. Had Stanton sold his stock for $200 per share, he would have received $484,133; but, as a matter of fact, Armour & Co. paid Stanton $576,400, or $92,267 in excess of $200 per share for the stock. What was this excess for? Stanton claims that it was for additional agreements he entered into with Armour & Co., viz.:

(1) He was not to engage in the meat business, or any other business then conducted by the corporation of E. H. Stanton Company, in

the states of Washington, Oregon, Idaho, and Montana for a period of 10 years.

(2) His personal guaranty of the collection of back accounts and accounts receivable of Stanton Company, less the amount collected by Armour & Co. on accounts which had theretofore been charged off to profit and loss; that is to say, if the losses on the accounts receivable exceeded the amounts collected on accounts which had been previously charged off to profit and loss, then Stanton would pay the difference to Armour & Co.

(3) His promise to assist Armour & Co. in and about the business of said corporation for the period of 6 months or a year.

Hample claims that the excess is accounted for in another way, viz.:

| | |
|---|---:|
| Additional $20 per share paid Stanton on his own 2,420⅔ shares.... | $48,413.66 |
| Additional $20 per share paid Stanton for Hample's 1,096¹/₃ shares | 21,926.07 |
| Additional $20 per share paid Stanton for Hamilton's 1,096⅓ shares | 21,926.07 |
| Total | $92,267.00 |

Stanton does not deny that the $92,267 paid him by Armour & Co. is correctly calculated on the basis of $20 per share for his own stock and in addition $20 per share for the stock of Hample and Hamilton; but his claim is that his original demand was $100,000 for the additional agreements, and that this amount was refused by the representatives of Armour & Co., and that the amount finally agreed upon was the equivalent of an additional $20 per share for the stock owned by Hample, Hamilton, and Stanton viz. 4,613⅓ shares at $20 per share, $92,267.

Was Stanton paid this entire sum of $92,267 for his additional agreements with Armour & Co., or only $20 per share on his own stock ($48,413.66) and the remainder ($43,853.34) as and for $20 per share on the stock of Hample and Hamilton? This was a question of fact for the jury, upon which there was evidence. There was the admitted option given by Stanton on 5,084⅓ shares at $220 per share cash. To this price the only objection made by Armour & Co. was that they could not pay cash, and it was thereupon agreed that they should not.

The agreement of May 21, 1917, between Armour & Co. and Stanton provided specifically that Armour & Co. would purchase from Stanton Co. at $220 per share, payable in four annual installments, to be evidenced by promissory notes, any further stock of the E. H. Stanton Company, regardless of the purchase price Stanton would pay for such stock. The offer was to remain open for a period of four months from the date of the agreement.

With respect to the agreement not to engage in the meat business then conducted by E. H. Stanton Company in a certain territory for the period of 10 years: Had that agreement any value in this transaction? Mr. O'Hern, the general superintendent of the Armour & Co. plants, whose deposition was taken on behalf of the defendant, testified that, in the negotiations with Stanton for the purchase of his stock, he spoke to Stanton about this feature of the transaction, and

Stanton said that there was no danger of his going into that business. He said he was selling out to get out. He had never been more successful in his life than he had been for the last two or three years, and he did not want to stay in the business. Prices were high, and he did not know of any better time to get out than then. He said he would be candid with Mr. O'Hern, and say that he would not sell out if he saw any prospect of continuing the business with his son taking hold of it, but his son did not seem to be inclined to it. He (Stanton) had been hammering away on the business for a number of years, and he felt that he ought to take a rest, and that he could not run the plant and do that. He was willing to guarantee that, because he was going out of the business for that reason. This evidence tended to show that this feature of the transaction had no value for Stanton.

With respect to the agreement that Stanton would guarantee the collection of the back accounts and the accounts receivable of Stanton Company, there was evidence that in 1912 the company was in a bad way financially, and to relieve the situation Stanton, Hample, and Hamilton agreed that each would take one-third of the treasury stock and pay for it. This stock appears to have been valued at $75,000. Hample and Hamilton paid $25,000 each in cash, and Stanton gave his check for that amount, and afterwards, without the knowledge of Hample and Hamilton, substituted his note for this check. At the time of the negotiations with Armour & Co., the principal and interest on this note was still unpaid. It was brought into the transaction, and E. H. Stanton Company canceled this note and returned it to Stanton. In the minutes of the corporation it was recited that this was done as an additional compensation for services rendered by Stanton.

At the trial in April, 1920, Stanton testified that up to date he had paid Armour & Co. $22,534 on bad accounts. The sale and transfer of the plant and books of accounts took place in May, 1917. It appears, also, that Stanton was given an automobile that had belonged to Stanton Company. This evidence tended to show that this feature of the transaction was met by the cancellation of Stanton's note and the transfer to him of the automobile.

With respect to Stanton's promise to assist Armour & Co., in and about the business of the corporation for the period of 6 months or a year, Stanton testified that he was actually out at the plant about 2 months, and rendered services in an advisory capacity up to about a week or 10 days before the trial. He testified that when they asked him any questions he answered them.

The $20 additional paid Stanton for his own stock amounted to $48,413.66. Assuming that this additional sum was a proper consideration for the agreements on his part, the evidence tends to show that it fully covered the additional agreements, if they had any value not otherwise provided for. Had he the right, then, to demand and receive from Armour & Co., and appropriate to his own use, the additional payment to him of a sum equivalent to $43,853.34 for the Hample and Hamilton stock? There was evidence that Stanton promised them that whatever price he received for his stock they should receive for theirs. Did this additional sum, paid outright or as an equivalent for the Hample and Hamilton stock, belong to them, or did it belong to Stanton?

The purpose of this suit is to determine that question with respect to the sum of $21,926.67 paid Stanton by Armour & Co. on account of the Hample stock. It is charged in the complaint that the defendant requested the plaintiff to hold his said stock, consisting of 1,096⅓ shares, and refrain from placing the same upon the market or sell the same until such time as the defendant should sell his stock in the corporation, and, in consideration of plaintiff's withholding his stock from the market, the defendant represented and promised the plaintiff that he would advise plaintiff of any opportunity to sell plaintiff's and defendant's stock together, and that the defendant would, without other consideration than the benefit accruing to him (the defendant) therefrom, act as the agent of plaintiff in placing plantiff's said stock with any purchaser to whom the defendant might desire to sell his stock, and would secure for plaintiff the best price possible, and the same price at which he (the defendant) should sell, if he concluded to sell, his stock; that in consideration of such representations and promises, plaintiff agreed to and did hold his said stock, and did depend upon the defendant to place said stock at such price as the defendant should secure for his own stock, in the event of an opportunity to sell; that during the month of May, 1917, without the knowledge or consent of the plaintiff, the defendant contracted to sell his (the defendant's) stock and also the plaintiff's stock to Armour & Co., and that the price stipulated in said contract of sale for said stock was $220 per share; that before the making of such contract between the defendant and said Armour & Co., defendant represented to plaintiff that he had an opportunity to sell plaintiff's stock and his (the defendant's) stock to Armour & Co., but falsely and fraudulently represented to plaintiff that the price defendant was to receive therefor was $200 per share; that defendant induced plaintiff to sell his stock to Armour & Co. for $200 per share, when in truth and in fact the sale was made by defendant to Armour & Co. at $220 per share, and the defendant took and received, and has since retained, the sum of $20 per share on plaintiff's stock sold to Armour & Co., amounting to $21,926.67.

The defendant, in his second amended answer, admits that plaintiff sold his stock to Armour & Co. for $200 per share, but further stated the fact to be that plaintiff negotiated the sale of his stock to Armour & Co. personally and without any representations being made to him by the defendant. Defendant admits that he received approximately $92,000, a sum arrived at by multiplying by $200, the number of shares owned by the defendant and his family, 2,420⅔ shares, and the plaintiff, prior to depositing his stock in the bank, became fully familiar with all the facts in relation thereto, but nevertheless, and, notwithstanding such knowledge, proceeded to and did deposit his stock in said bank as provided for in said agreement, and proceeded to carry such agreement into effect.

[1] Upon these issues the court submitted the case to the jury upon certain instructions. To four of these instructions the defendant (plaintiff in error here) assigns error. In the first instruction the court said:

"If you find in this case, from a preponderance of the testimony, that the defendant assumed and agreed to and did actually conduct the negotiations which resulted in the sale of the stock from the plaintiff to Armour & Co.; that the plaintiff had no information concerning the price which Armour & Co. was willing to pay, or the price which the defendant was to get for his stock, except such as defendant gave him; that by reason of the misstatement or concealment of any material fact or facts by defendant the plaintiff was induced to accept $200 a share for his stock, whereupon $20 on the number of shares owned by him was added to the price paid to the defendant for his stock without the plaintiff's knowledge or consent; and that this $20 a share was added to the price paid defendant, because Armour & Co. had been able to procure plaintiff's stock for $200 a share—then I charge you that the amount of money thus received, to wit, $20 a share, on the number of shares owned by plaintiff, rightfully belongs to the plaintiff, and that the defendant in equity and good conscience cannot retain it, and that your verdict should be for the plaintiff in that amount, together with interest thereon from the time of its receipt by the defendant at the rate of 5 per cent. per annum."

The plaintiff in error objects to this instruction on the ground that there was no evidence to support it. In our opinion, the evidence, with the legitimate inferences that might be drawn therefrom, was sufficient to justify this instruction. Both Hample and Hamilton testified that Stanton urged them to leave to him the negotiations for selling their stock to Armour & Co.; that he would drive as hard a bargain with Armour & Co. as he could, and would not sell his stock, unless he could also sell theirs; and that they would receive the same price for their stock that he received for his.

[2] Besides, counsel for the defendant asked for instructions that assumed that there was evidence tending to prove that the defendant did in fact sell plaintiff's stock. The instructions requested were as follows:

"If you find from the evidence that of the consideration named in said written contract, to wit, $576,400, $92,266.66 thereof was paid or agreed to be paid to the defendant Stanton for his agreement to guarantee said book accounts, and not to engage in said business in said states for the period named, then you must find as a fact that Stanton sold his own stock and the stock of the members of his family for the same price at which the plaintiff's stock was sold, and that the plaintiff cannot recover in this action, even though you should find under the evidence that the defendant did in fact sell the plaintiff's stock."

[3] But, aside from this requested instruction, there was no request by the defendant for a directed verdict, and no motion for a nonsuit, and no motion for a new trial. The question was properly submitted to the jury. Hartford Ins. Co. v. Unsell, 144 U. S. 439–451, 12 Sup. Ct. 671, 36 L. Ed. 496; Hansen v. Boyd, 161 U. S. 397–402, 16 Sup. Ct. 571, 40 L. Ed. 746; Little Rock M. R. Co. v. Moseley, 56 Fed. 1009, 6 C. C. A. 225; Alaska Pacific S. S. Co. v. Egan, 202 Fed. 867, 868, 121 C. C. A. 225.

[4] The court also instructed the jury that, if the plaintiff conducted the negotiations for the sale of his own stock on his own responsibility, without advising or consulting with the defendant, and fixed upon his own selling price, there could be no recovery in the action, even though the defendant may have received a greater price for his own stock. To this requested instruction the court added:

"Unless you find from a preponderance of the testimony that a part of the consideration for the sale of the stock owned by the plaintiff was actually paid to and received by the defendant and is still retained by him. In the latter event, the plaintiff is still entitled to the right to recover regardless of the question of agency."

It is contended that this instruction was not within the issues as made by the pleadings or by the evidence. Defendant's second amended answer distinctly alleges that plaintiff sold his own stock to Armour & Co. for $200 per share, and further that plaintiff negotiated the sale of his stock to Armour & Co. personally, and without any representation being made by the defendant. This instruction was clearly within the issues of the pleadings, and was justified by the evidence that the defendant was paid the amount or equivalent of $20 per share on plaintiff's shares of stock. ·

[5, 6] For what purpose was this additional sum paid the defendant? Was it actually paid to and received by defendant as and for plaintiff's stock? If the jury answered this last question in the affirmative, then their verdict could not be for the defendant. The instruction was clear, concise, and directed the attention of the jury to the actual question of fact they were called upon to determine. This same qualification was added by the court to two other instructions, and in our opinion was justified by the character of the questions submitted to the jury for their determination. It is objected that its reiteration was prejudicial and confusing. It was the duty of the court to instruct the jury clearly upon the real, substantial questions at issue, and we do not see how reiteration was prejudicial or confusing. Moreover, it was the duty of the court to make the law clear and understandable by the jury, and not to indulge in unnecessary technical discussions upon nice distinctions between a case of agency, a case of fraud, or a case of confidential relations. The plaintiff had stated the facts of his cause of action in his complaint in ordinary and concise language and had submitted the evidence in its support. The question was: Had the defendant received and retained plaintiff's money? On this question the jury found for the plaintiff, and we think the instructions were without error.

Judgment of the District Court affirmed.